IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FREDERICK WILLIAM KARASH,    )
        Plaintiff,    )    Civil Action No. 15-28 Erie
            )
    v.    )
            )    Magistrate Judge Baxter
TROOPER MACHACEK, et al.,    )
        Defendants.    )

## MEMORANDUM OPINION[1]

United States Magistrate Judge Susan Paradise Baxter

## I.    INTRODUCTION

### A.    Relevant Procedural History

On January 20, 2015, Plaintiff Frederick William Karash filed this *pro se* civil rights

action, pursuant to 42 U.S.C. § 1983, against the following Defendants who are all employed by

the Pennsylvania State Police Department: Trooper Machecek  ("Machacek"); Trooper Kloss

("Kloss"); Trooper Zinram ("Zinram"); Trooper Sterniak ("Sterniak"); Corporal Dietz ("Dietz");

Trooper Rodgers ("Rodgers"); Trooper Angelo ("Angelo"); Trooper Weindorf ("Weindorf"); and

Trooper Pierce ("Pierce") (collectively referred to as "PSP Defendants"). Plaintiff subsequently

filed an amended complaint adding Erie County Coroner Lyell P. Cook ("Cook") and the

Commonwealth of Pennsylvania ("Commonwealth") as Defendants.  The amended complaint

[ECF No. 25] is deemed to have superseded the original complaint and is the operative pleading

in this case.

---

[1]

All parties have consented to having a United States Magistrate Judge exercise jurisdiction over this matter. [ECF Nos. 4, 8, 55].

By Opinion and Order dated March 31, 2016, this Court dismissed Plaintiff's claims against Defendants Commonwealth and Cook, as well as Plaintiff's state law and Pennsylvania Constitution claims against the PSP Defendants [ECF No. 56]. Thus, the only claims left in this case are various illegal search and seizure claims under the fourth amendment to the United States Constitution against the PSP Defendants. In particular, Plaintiff raises the following Fourth Amendment claims, as identified by Defendants: (1) an illegal entry claim against Defendants Machacek, Sterniak, Kloss, Pierce, and Dietz; (2) an illegal seizure claim against Defendants Machacek, Sterniak, Kloss, Pierce, and Dietz; (3) an illegal search warrant for lack of probable cause claim against Defendant Kloss; and (4) an illegal execution of search warrant claim against all Defendants except Defendant Sterniak.

On December 30, 2016, the PSP Defendants filed a motion for summary judgment [ECF No. 92], contending that Plaintiff's claims are barred by the doctrine of qualified immunity because "the alleged Fourth Amendment 'rights' being asserted by plaintiff were not clearly established so that reasonable troopers would know their conduct was unlawful" and, alternatively, "the record does not support a Fourth Amendment violation with respect to any of the actions challenged by Plaintiff." (ECF No. 94, Defendants' Brief, at pp. 5-6). Plaintiff has since filed a response brief, essentially reiterating the bases for his claims. [ECF No. 99]. This matter is now ripe for consideration.

### B.    Relevant Factual History[2]

On July 25, 2013, fireman Frank Fisher ("Fisher") was the first responder to a 911 call at

---

[2] The factual history recited herein is gleaned from the Defendants' concise statement of undisputed material facts [ECF No. 95], and Plaintiff's responses thereto [ECF No. 101], to the extent the facts are undisputed and/or amply supported by the factual record before this Court. Where there are discrepancies in the parties' interpretations of the documentary evidence of record, the Court draws from and cites the documents themselves.

9:10 a.m. from Plaintiff's brother, Matthew Karash ("Matthew"), requesting medical help at Plaintiff's residence (also Matthew's residence). (ECF 95, Defendants' Concise Statement of Undisputed Material Facts, at ¶ 1). Fisher understood the call to be related to a cardiac arrest, but upon arrival to the scene and entering Plaintiff's bedroom, he was told by Plaintiff, who was performing CPR on Traci Fewell ("Ms. Fewell") when Fisher arrived, that Plaintiff thought Ms. Fewell had shot herself. (Id. at ¶¶ 1, 4, 5; ECF No. 100-2, transcript of June 27, 2014 Suppression Hearing, at p. 10). Fisher then left the residence and requested police assistance because "we had a gunshot situation." (ECF No. 100-2 at p. 10). Fisher then returned to the bedroom and moved to a nearby dresser a firearm that had been on the bed next to Ms. Fewell and Plaintiff. (Id. at p. 12). Other emergency responders then arrived on the scene. At approximately 9:46 a.m., Ms. Fewell was pronounced dead by one of the EMT's at the scene. (Id. at p. 13; ECF No. 5, at ¶ 14).

Defendant Machachek was the first law enforcement officer on the scene. (ECF No. 100-2 at p. 13). He arrived at approximately 9:35 a.m. and was met by Fisher who was outside of the residence. Fisher explained to Defendant Machacek that Ms. Fewell was dead and that he'd moved the gun from the bed to the dresser. (Id.). Defendant Machacek then entered Plaintiff's residence and found a number of first responders inside the residence, in addition to Plaintiff. (ECF No. 100-4, transcript of July 9, 2014 Suppression Hearing, at p. 17.

Once in the residence, Defendant Machacek went with Fisher to the bedroom where Ms. Fewell was located, saw Ms. Fewell, unloaded the firearm that was on the dresser, took "a quick glance to make sure no one else was in the residence and the firearm was out of reach of everybody," and removed everyone, including himself, from the home. (ECF No. 100-4, at p. 78). Defendant Machacek did not go toward the back of the residence where Matthew's bedroom

3

was located during this initial entrance into Plaintiff's residence. (ECF No. 95, at ¶¶ 47-48; ECF No. 93-3, transcript of Machacek deposition at pp.16 (internal p. 27)). From the time Defendant Machacek first entered Plaintiff's residence until he exited it, five to ten (5-10) minutes had passed. (ECF No. 100-4 at p. 78). Additionally, at some point during this initial entrance, Defendant Machacek learned, either from Plaintiff or from Fisher, that Plaintiff had found Ms. Fewell shortly after 9:00 a.m., took the gun from her hand, set it to the side on the bed, and began CPR on Ms. Fewell. (Id. at p. 77).

Defendant Sterniak arrived at the scene a few minutes after Defendant Machacek, at approximately 9:40 a.m., in response to a call regarding a female with a gunshot wound. (ECF No. 93-4, transcript of Sterniak deposition, at pp. 3-4 (internal pp. 4-7)). He went to help out if anything was needed. (Id. at p. 3 (internal p. 4)). Defendant Sterniak entered the bedroom where Ms. Fewell was located, got sick to his stomach, and left the residence; he was in Plaintiff's home for one to two (1-2) minutes before leaving it. (Id. at p. 4 (internal pp. 6-7)). After that point, Defendant Sterniak stayed outside Plaintiff's residence and was primarily responsible for making sure no one went into the house "to maintain the scene." (Id. at p. 5 (internal pp. 10-12). Defendant Sterniak did not enter Plaintiff's residence after the search warrant arrived; he left the scene before the warrant arrived. (Id. at p. 6 (internal p. 14).

From the time Defendant Machacek initially removed everyone from Plaintiff's residence, no one went back into the residence until Defendant Kloss arrived on the scene, at 10:06 a.m. (ECF No. 93-1, Application for Search Warrant, at p. 4). Defendant Kloss was dispatched to Plaintiff's residence as part of a criminal investigation unit for investigation of a death. (ECF No. 93-4, transcript of Defendant Kloss's deposition, at p. 22 (internal p. 4)). He met Defendant Machacek on the porch, was briefed, entered the residence, and went through the

4

kitchen and living room into the bedroom where Ms. Fewell's body was located. (Id. at pp. 22-23

(internal pp. 5-6); ECF No. 93-2, Declaration of James Kloss, at ¶ 4). Trooper Kloss then walked

out of the bedroom, across the living room and peered into the two other bedrooms before

exiting the residence. (ECF No. 93-2, at ¶ 5). Defendant Kloss explained:

> [m]y purpose in doing this was to get a general sense of the lay-out of the
> house, but also for safety – to make sure no one else was in that residence
> and everything was fine and safe.  I knew Trooper Machacek was young
> and inexperienced and the area was congested and confused, especially
> with the number of EMT personnel I had seen.  I believed a brief
> protective sweep with more experienced eyes was necessary under the
> circumstances.

Id.  While Defendant Kloss was in Plaintiff's bedroom, he saw, next to the gun and in plain view,

green vegetable matter which, based upon his experience as a police officer, he knew to be

marijuana. (ECF No. 93-4, at pp. 23-24 (internal pp. 9-10)). He also saw prescription pills not in

containers in the kitchen and a pipe/bong on a cupboard between the kitchen and living room.

(Id. at p. 24 (internal p.13). Defendant Kloss did not know if the pipe/bong was seized, but the

prescription pills were not seized because "through the search warrant they matched up with the

prescription bottles that we discovered." (Id. at pp. 24-25 (internal pp. 13-15)).

When Defendant Kloss went into Plaintiff's residence, Defendant Machacek went back

into the residence with Defendant Kloss "to show them what we had." (ECF 93-3, at p. 13

(internal p. 17)). Additionally, at some point, Defendant Machacek retrieved the serial number

from the gun on the dresser and called it in to the station. (ECF No. 93-3, at p. 22 (internal p.

50)).

Defendant Dietz also entered Plaintiff' residence that morning at approximately 10:08

a.m. (ECF 93-1, Crime Scene Entry Log, at p. 41). He was there in response to the call of a

victim with a gunshot wound. (ECF 93-4, transcript of Dietz deposition, at p. 10 (internal p. 4)).

He entered Plaintiff's residence because:

> Trooper Machacek doesn't have that much time on. He didn't look in every single area of the residence. We need to do a quick sweep for life-safety reasons, you know, is there -- you know, we don't know anyone there. We don't want to -- for safety, we don't want to get hurt.
>
> We don't want to have someone else in there that's possibly hurt and still alive that can be saved, and we also want to get a look at the body to see if there's anything that, you know, we could obtain for -- that we would need to further search for if there be any fruits of a crime, you know. Are any windows broken? Did anyone break in?

(Id. at pp. 10-11 (internal pp. 5-6)). Defendant Dietz was right behind Defendant Kloss when Kloss cleared Matthew's bedroom. (Id. at 12 (internal p. 13)).

Defendant Pierce was the lead criminal investigator on the scene that day. (ECF 93-2, at p. 31, ¶ 2.  He was responding to the 911 call for assistance by Plaintiff's brother.  ECF 93-3 at 48, p. 4.  Upon arriving at the scene at approximately 10:11 a.m., he entered Plaintiff's residence and went into Plaintiff's bedroom with Trooper Machacek who briefed him.   ECF 93-2, Declaration of Sean Pierce, at p. 32, ¶ 3; ECF No 93-3, transcript of Pierce deposition, at p. 48 (internal p. 5)). It was Defendant Pierce's understanding when he arrived that Ms. Fewell was deceased. (ECF No. 93-3 at 49 (internal p. 8)). Defendant Pierce elaborated, "At that point, I understood we had an individual in a bed, deceased as a result of a gunshot wound to the head, possibly self-inflicted. I didn't know if it was suicide or homicide, and I certainly hadn't reached any conclusion about needing a search warrant or what we were going to do. I wanted to take a look at the body myself, and walked with Machacek into the house, to the master bedroom." (ECF No. 93-2, at p. 32, ¶ 3). Defendant Pierce determined, based on the totality of the circumstances, that a search warrant was needed. (Id. at ¶¶ 3-5). In particular, Defendant Pierce declares as follows:

> I recall Trooper Machacek back-briefing me on what he had found, and
> also what Fred and Matthew Karash had told him - that  Matthew Karash
> was home all evening but heard nothing; Fred Karash was reported to have
> been at work all evening and discovered her on the bed with a pillow over
> her head; Fred Karash also told Trooper Machacek he had recently
> discovered that Fewell had cheated on him with one of his friends; and the
> .357 magnum which was alleged to have been used in the shooting was
> owned by Fred Karash. When I coupled this with Fred Karash's demeanor
> (I've responded to similar situations and his uncooperative attitude was not
> typical of someone whose loved one just committed suicide), I made the
> determination to get a search warrant and we all left the house.

(ECF 93-2 at 32-33, ¶ 5). At that point everyone, law enforcement and civilians alike, left

Plaintiff's residence, and the residence was secured by 10:38 a.m. (Id.; ECF 93-1 at p. 44).

At Defendant Pierce's instruction, Defendant Kloss left the scene to prepare a search

warrant application related to Ms. Fewell's death and suspected illegal drug possession by

Plaintiff and Matthew. (ECF 93-2, Declaration of James Kloss, at p. 25, ¶ 6). Defendant Kloss

declares that, while he was at the PSP barracks, he would have seen the CLEAN

("Commonwealth Law Enforcement Assistance Network") query on the firearm found next to

Ms. Fewell. The query, which was conducted at 10:38 a.m. on July 25, 2013, indicated that the

firearm was registered to Cyril Nick Ley Jr. (Id. at pp. 27-28, ¶ 12; ECF No. 93-1, Declaration of

Lt. Mark J. Shaver, at p. 48, ¶¶ 3-4). Later that day, after the search warrant was issued,

Defendant Kloss was told that Plaintiff had purchased the weapon from Valley Gun Works.

(ECF No. 93-2 at p. 28, ¶ 12). On July 26, 2013, Defendant Kloss confirmed with Valley Gun

Works that the gun had been transferred to Plaintiff in May, 2013. (Id.).

Magisterial District Judge Scott Hammer signed the application for search warrant, as the

issuing authority, at 3:15 p.m. on July 25, 2013, and his seal was twice stamped on the

document, and he also signed as the issuing authority on both pages of the affidavit of probable

cause accompanying the application for search warrant. (ECF 93-1 at pp. 2-5). Defendant Kloss

returned to Plaintiff's residence with the search warrant at approximately 3:40 p.m. on July 23,

2015, handed Plaintiff a copy of the warrant, and read the warrant to Plaintiff on the deck of his

residence. (ECF 93-4, transcript of Kloss deposition, at p. 29 (internal pp. 31-32)).

During the time Defendant Kloss was obtaining the search warrant, Plaintiff was not

allowed back into his residence other than, perhaps, once in order to get clothes; otherwise, he

remained outside his residence. (ECF No. 93-3, transcript of Machacek deposition at p. 20

(internal pp. 43-44)). Plaintiff's mother, Rhonda Wilkinson ("Wilkinson"), arrived on the scene

at approximately 3:00 p.m. on July 25, 2013. (ECF No. 100-13, transcript of Wilkinson

deposition at p. 6 (internal p. 5)) Upon her arrival, Wilkinson observed officers/detectives going

in and out of Plaintiff's house. (Id.). While at the scene, Wilkinson asked Plaintiff if the police

had given him any paperwork; Plaintiff responded no, and she did not see him with any

paperwork until very late in the afternoon. (Id. at p. 8 (internal p. 7)).

Defendant Rogers arrived at Plaintiff's residence on July 25, 2013 in the late morning,

before lunch. (ECF No. 93-3, transcript of Defendant Rogers deposition, at p. 34 (internal p. 4)).

He stayed in his unmarked vehicle in front of the residence for a few hours. (Id.). Defendant

Rogers got out of his vehicle once he was told that there was a signed search warrant. (Id. at p.

35 (internal p. 7)). He did not read the search warrant. (Id. at p. 35 (internal p. 6)). Defendant

Rogers heard Defendant Kloss read the warrant to Plaintiff. (Id. at 35 (internal p. 14)). He then

entered Plaintiff's residence and looked around. (Id. at 35 (internal p. 8)). Thereafter, Defendant

Rogers, along with Defendant Pierce, interviewed Plaintiff outside. (Id. at 38 (internal p. 19)).

Defendant Weindorf got a phone call to provide assistance at Plaintiff's residence and

arrived on the scene at between noon and 1 p.m. on July 25, 2013. (ECF No. 93-3, transcript of

Weindorf deposition, at p. 60 (internal p. 4)). The residence was locked down at the point

waiting for the search warrant. (Id.). Once the search warrant arrived, Defendant Weindorf entered Plaintiff's residence to assist in the search. (Id. at pp. 61-62 (internal pp. 9, 11-12)). He did not read the warrant; Defendant Kloss had the search warrant in his hand and told Defendant Weindorf what they were searching for. (Id. at pp. 61-62 (internal pp. 9-10)).

Defendant Kloss asked Plaintiff to open a gun safe that was located in the living room. (ECF No. 93-4, transcript of Kloss deposition, at p. 33 (internal p. 48)). Plaintiff did not want to open it, but eventually unlocked it. (Id.  at p. 34 (internal p. 50)). The safe was not mentioned in the search warrant, but Trooper Kloss asked Plaintiff to open the safe because he believed that he had the right to investigate the safe based on the warrant. (Id. at p. 33 (internal p. 49)). Defendant Kloss told Plaintiff "[w]e'll take the safe, or I'll have a gunsmith come in and open it or a locksmith come in and open it." (Id. at p. 34 (internal p. 50)). Defendant Kloss testified that he had known drugs to be kept in safes; however, no drugs were found in the safe, but a .357 caliber gun was seized. (Id.)

Defendant Weindorf was present when Plaintiff opened the gun safe in his living room, but did not search the safe. (Id. at p. 62 (internal p. 12)). He also did not participate in creating the inventory receipts or witnessing the inventory receipts. (Id.). The receipts were generated outside of the residence. (Id. at p. 63 (internal p. 14)). Defendant Weindorf was in the residence with Defendants Kloss and Machacek after the search warrant was issued, helping Troopers Kloss and Machacek search for drugs and paraphernalia. (ECF No. 93-4, transcript of Kloss deposition at p. 31 (internal p. 41)). Defendant Weindorf did not recall seeing any drugs or paraphernalia in Plaintiff's bedroom; his concentration was in searching around the bed "and stuff like that." (ECF No. 93-3, transcript of Weindorf deposition, at p. 63 (internal pp. 15-16)).

Defendant Angelo arrived on the scene before lunchtime on July 25, 2013. (<u>Id.</u> at p. 66 (internal p. 4)). He entered Plaintiff's residence after 4 p.m., when there was a warrant on the scene. (<u>Id.</u> at p. 66 (internal p. 5)). He did not read the warrant prior to entering the residence. (<u>Id.</u>). In Plaintiff's residence, Defendant Angelo observed some contraband, possibly in the kitchen or living room, and also observed "what appeared to be green vegetable matter which I would find consistent with marijuana" in Plaintiff's bedroom. (<u>Id.</u> at p. 67 (internal p. 8)). There were other officers in Plaintiff's residence prior to Defendant Angelo's entry. (<u>Id.</u> at p. 67 (internal p. 9)).

Defendant Zinram was responsible for photographing the scene. (ECF No. 93-3, Declaration of Scott Zinram, at p. 2, ¶ 3). Defendant Zinram had not worked in forensics for years, and was off duty on July 25, 2013, when he received a call to see if he could assist at the scene by photographing and processing the scene because the rest of the forensics team was assigned elsewhere. (<u>Id.</u> at ¶¶ 2-3). He agreed and arrived at Plaintiff's residence no earlier than 2:30 p.m. (<u>Id.</u> at ¶ 3). Defendant Zinram stated that he took photographs of the outside of the residence while he waited for the warrant and he did not enter the house and take photographs therein until after the warrant arrived. (<u>Id.</u> at p. 3, ¶ 4). Defendant Zinram also explained that the camera he used to photograph the scene was still set for standard time (daylight savings time had started in March 2013), such that the times on the disc of photographs that was downloaded from the camera's memory card, and the chart of photograph numbers, "is one hour off (one hour early)." (<u>Id.</u> at p.3, ¶¶ 3-5, 7). Corporal Christine Lench, a corporal with the PSP assigned to the Erie barracks as Supervisor of the Forensics Unit, explained that the unit's cameras are not connected to wi-fi, and thus, do not automatically update for daylight savings time; the time must

be manually reset, and it is not unusual for officers to overlook this reset feature. (ECF No. 93-2, Declaration of Corporal Christine Lench, at p. 20, ¶¶ 1-3).

Defendant Pierce confirmed that Defendant Zinram did not enter Plaintiff's residence and start taking photographs until the warrant was at the scene. (ECF No. 93-2, Declaration of Sean Pierce, at p. 34, ¶ 9). The crime scene entry log lists Defendant Zinram on the scene at 3:40 p.m. and the coroner on the scene from 4:05 p.m. to 5:19 p.m. (ECF No. 93-1 at 44). Defendant Pierce entered Plaintiff's residence shortly after Defendant Zinram entered, and assisted the coroner for the next hour. (ECF No. 93-2 at p. 34, ¶ 9).

Defendant Walton arrived at Plaintiff's residence between 12 p.m. and 1 p.m. to assist in a death investigation. (ECF 93-4, transcript of Walton deposition, at p. 18 (internal p. 3)). Once there, he conducted interviews with the neighbors until 4 p.m. or 5 p.m. (Id. at p. 18 (internal pp. 4-5). He did not go inside of Plaintiff's residence. (Id. at p. 19 (internal p. 6)). As evidence was brought out of Plaintiff's residence related to the death, such as guns, ammunition, and spent ammunition, he noted the evidence on the search warrant inventory. (Id.). He did not look at the search warrant, nor did he actually see the items inside the house; he "just knew that was what they were taking out of the house." (Id. at p. 19 (internal pp. 8)).

Both inventories were created outside of Plaintiff's residence, in the driveway. (ECF 93-3, transcript of Machacek deposition, at p. 26 (internal pp. 68-69)). Plaintiff was about twenty to thirty (20-30) feet away when the inventories were being done. (Id. at p. 26, (internal p. 69)). Defendants Walton and Kloss prepared the inventories. (ECF No. 93-4, transcript of Walton deposition, at 19 (internal p. 6); ECF No. 93-4, transcript of Kloss deposition, at pp. 31-32 (internal pp. 41-42)).

### C.      Standards of Review

#### 1.      Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Under Rule 56, the district court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56).

The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.  Id. at 330; see also Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metro. Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004). When a non-moving party would have the burden of proof at trial, the moving party has no burden to negate the opponent's claim.  Celotex, 477 U.S. at 323.  The moving party need not produce any evidence showing the absence of a genuine issue of material fact.  Id. at 325.  "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  Id.  After the moving party has satisfied this low burden, the nonmoving party

12

must provide facts showing that there is a genuine issue for trial to avoid summary judgment.  Id. at 324.  "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."  Id.; see also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001); Garcia v. Kimmell, 381 F.App'x. 211, 213 (3d Cir. 2010) (quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005)) (the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.") (internal citation omitted).

In considering these evidentiary materials, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion."  Scott v. Harris, 550 U.S. 372, 378 (2007) (internal quotation marks and alterations omitted); see also Doe v. Cty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001) (when applying this standard, the court must examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material.  Anderson, 477 U.S. at 248, 255 ("only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Id. at 249. The court may consider any evidence that would be

admissible at trial in deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993).

### 2.   *Pro Se* **Pleadings**

Plaintiff is proceeding *pro se. Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520–21 (1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); U.S. ex rel. Montgomery v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969) (petition prepared by a prisoner may be inartfully drawn and should be read "with measure of tolerance"). Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir. 1997), overruled on other grounds by Abdul-Akbar v. McKelvie, 239 F.3d 307, 311 (3d Cir. 2001).  See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996) (discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990) (same).

When considering a motion for summary judgment, however, the traditional flexibility toward *pro se* pleadings does not require the Court to indulge evidentiary deficiencies. See Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 249 (3d Cir. 2013) (citing Brooks v. Kyler, 204 F.3d 102, 108 n. 7 (3d Cir. 2000)) (indicating that *pro se* litigants still must present at least affidavits to avoid summary judgment).  Accordingly, because Plaintiff is a *pro se* litigant, this Court will consider the facts and make inferences where it is appropriate.

**D.**     **Discussion**

Defendants argue that the record does not support a Fourth Amendment violation as to any of their alleged actions and, thus, summary judgment must be entered in their favor. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.

Alternatively, Defendants argue that Plaintiff's claims are barred by the doctrine of qualified immunity because the alleged "rights" being asserted by Plaintiff were not clearly established so that reasonable troopers would know that their conduct was unlawful.

As explained in Paoli v. Stetser, 651 Fed. Appx. 123 (3d Cir. June 8, 2016):

> Qualified immunity bars claims against government officials "as long as those officials' actions 'd[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Thus, a court ruling on qualified immunity must decide two issues: (1) whether the facts alleged, taken in a light most favorable to the plaintiff, show a violation of a constitutional right, and (2) whether such right was clearly established in light of the specific factual context. The court may decide the question of whether there was a "clearly established right" without first determining if a violation of a constitutional right occurred.

Paoli, 651 Fed. Appx. at 125 (footnotes omitted).  Qualified immunity exists to give "government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Id. at 126 (footnote omitted).  Qualified immunity is an affirmative defense for which the government official bears the burden of proof." Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982). A movant seeking summary judgment on an affirmative defense "bear[s] the burden of proof at trial and therefore must show that it has produced enough evidence to support the findings of fact necessary to win." El v. SEPTA, 479 F.3d 232, 237 (3d Cir. 2007) (footnote omitted).

**1.    Plaintiff's Fourth Amendment claim based upon Defendants' multiple entries into Plaintiff's residence on July 25, 2013**

Defendants first argue that, to the extent Plaintiff's Fourth Amendment claim is based upon the individual Defendants' entries into Plaintiff's residence on July 25, 2013: "This record does not establish a violation of Plaintiff's Constitutional rights," and "[a]t a minimum Plaintiff's claimed 'right' in this case – ie., not to have troopers enter his home to observe the victim and sweep the residence in response to a reported gun shot death – was not so clearly established that reasonable officers would have known their conduct to be unlawful." (ECF No. 94 at p. 15).

The Court shall first examine whether Plaintiff has asserted a right under the Fourth Amendment that was clearly established. As explained by the Paoli court, *supra.*:

> whether a right has been "clearly established" depends on "the specific context of the case," and the right at issue may not be simply "a broad general proposition." For a right to be "clearly established," the contours of the right must be sufficiently clear that a reasonable official would know that his conduct violates that right. Thus, [Plaintiff] must demonstrate that a specific Fourth Amendment right—not merely a general right against unreasonable searches and seizures—was clearly established at the time of the alleged violation, based on the specific context of [his] case.

Paoli, 651 F. App'x at 125 (footnotes omitted).

In Mincey v. Arizona, 437 U.S. 385 (1978), the Supreme Court explained that warrants are generally required to search a person's home or his person unless "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey, 437 U.S. at 393-94, citing McDonald v. U.S., 335 U.S. 451, 456 (1948); Johnson v. U.S., 333 U.S. 10, 14–15 (1948). See also Groh v. Ramirez, 540 U.S. 551, 552 (2004) ("absent consent or exigency, a warrantless search of a home is presumptively unconstitutional."). In particular:

… [T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities....

Mincey, 437 U.S. at 392-393 (citations omitted).

The Third Circuit Court adds that:

It is 'a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' *United States v. Harrison*, 689 F.3d 301, 306 (3d Cir. 2012)(quoting *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991)). Nowhere is this more true than in the home, the threshold of which may only be crossed without a warrant or consent when exigent circumstances exist. See *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *id.* at 585, 100 S.Ct. 1371 ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (internal citation and quotation marks omitted)); see also *Kirk v. Louisiana*, 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002) ("As Payton makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.").

\*                    \*                    \*

The common thread is imminence – 'the existence of a true emergency.' *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011). "[O]nce the exigencies of the initial entry have dissipated, the police must obtain a warrant for a[ny further search of the premises." *United States v. Murphy*, 516 F.3d 1117, 1121 (9th Cir. 2008) (citing *Mincey v. Arizona*, 437 U.S. 385, 392–93, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)), abrogated on other grounds by *Fernandez v. California*, ——— U.S. ———, 134 S.Ct. 1126, 188 L.Ed.2d 25 (2014).

U.S. v. Mallory, 765 F.3d 373, 382-84 (3d Cir. 2014).

Further:

'Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others.' *Coles,* 437 F.3d at 366 (citing *United States v. Richard,* 994 F.2d 244, 248 (5th Cir.1993)); *see also Couden,* 446 F.3d at 496 ("Exigent circumstances exist where 'officers reasonably ... believe that someone is in imminent danger.' ") (quoting *Parkhurst v. Trapp,* 77 F.3d 707, 711 (3d Cir.1996) (emphasis omitted)). To be reasonable, a warrantless search premised on exigent circumstances must also be supported by probable cause. *Coles,* 437 F.3d at 365. In determining whether there were exigent circumstances, a court reviews the totality of the circumstances, including "the facts and reasonably discoverable information available to the officers at the time they took their actions." *Estate of Smith v. Marasco,* 318 F.3d 497, 518 (3d Cir. 2003) (citing *United States v. Sculco,* 82 F.Supp.2d 410, 417 (E.D.Pa.2000)); *see also Rubin,* 474 F.2d at 268.

U.S. v. Parris, 229 F. App'x 130, 133-34 (3d Cir. 2007). "The Government bears the burden of demonstrating that exigent circumstances justified a warrantless search, and that burden is 'heavy'." Mallory, 765 F.3d at 383–84, quoting Welsh v. Wisconsin, 466 U.S. 740, 749–50 (1984)).

Here, the record reveals that Defendant Machacek entered Plaintiff's residence without a warrant after he responded to a 911 call from Fisher requesting police because "we had a gunshot situation," arrived on the scene to be told by Fischer that Ms. Fewell was dead, there was a gun in the bedroom that presumably was loaded, and Plaintiff and numerous emergency personnel were in the house. Thereafter, Defendant Machacek went directly to Plaintiff's bedroom where Ms. Fewell was located, viewed the scene therein, secured the weapon located in the bedroom, took "a quick glance to make sure no one else was in the residence and the firearm was out of reach of everybody," and removed everyone, including himself from the residence. The Court concludes that this scenario equates to exigent circumstances such that Defendant Machacek did not violate Plaintiff's rights under the Fourth Amendment by his warrantless entrance into, and subsequent search of, Plaintiff's residence upon his arrival at the scene. As the Supreme Court

noted in <u>Mincey</u>, *supra.*, "[w]e do not question the right of the police to respond to emergency situations." <u>Mincey</u>, 437 U.S. at 392. Accordingly, this initial warrantless entrance by Defendant Machacek into Plaintiff's residence did not violate Plaintiff's rights under the Fourth Amendment, and Defendant Machacek is entitled to summary judgment to the extent that Plaintiff claims that he violated Plaintiff's Fourth Amendment rights when he first entered Plaintiff's residence on July 25, 2013.

Similarly, the Court finds that Defendant Sterniak was acting under exigent circumstances when he entered Plaintiff's home without a warrant in order to assist Defendant Machacek in whatever way he could. Therefore, Defendant Sterniak's warrantless entrance into Plaintiff's residence did not violate Plaintiff's rights under the Fourth Amendment and said Defendant is entitled to summary judgment to the extent that Plaintiff claims he violated Plaintiff's Fourth Amendment rights when he entered Plaintiff's residence on July 25, 2013.

However, a reasonable jury could conclude that once Defendant Machacek "cleared" the residence and removed everyone from Plaintiff's residence, including himself, the exigent circumstances that permitted a warrantless entry into Plaintiff's residence had dissipated such that subsequent entry into Plaintiff's residence by Defendants Kloss and Dietz, and Defendant Machacek's subsequent reentry with one or more of them, was a general exploratory search, and not a limited "victim-or-suspect" search. Thus, at the very least, there is a genuine issue of material fact as to whether these Defendants violated Plaintiff's Fourth Amendment rights when they entered his residence on July 25, 2013 after Defendant Machacek had initially "cleared" the residence. <u>See</u> <u>Bodine v. Warwick</u>, 72 F.3d 393, 399 (3d Cir. 1995) (issue of whether exigent circumstances existed should go to jury when there are disputed factual issues). Moreover, the presence of genuine issues of material fact preclude a determination that these Defendants are

entitled to qualified immunity as to this Fourth Amendment claim by Plaintiff, i.e., a reasonable officer would arguably have been on notice that entering Plaintiff's residence under these circumstances, absent a warrant, was a violation of Plaintiff's rights under the Fourth Amendment. Accordingly, Defendants' motion for summary judgment is denied to the extent it seeks summary judgment on Plaintiff's claim that Defendants Kloss, Dietz, and Machacek violated Plaintiff's rights under the Fourth Amendment when they entered Plaintiff's residence after Defendant Machacek had already "cleared" the residence.

Furthermore, as to Defendants Pierce and Zinram, the Court finds that there is a genuine issue of material fact as to whether Defendants Pierce and Zinram violated Plaintiff's  Fourth Amendment rights by entering Plaintiff's residence in the afternoon of July 25, 2013, prior to Defendant Kloss returning to Plaintiff's residence with a search warrant. In particular, the Court cites the following evidence of record that conflicts with Defendants' general assertion that the photographs taken with Defendant Zinram's camera displayed the wrong time because it was not adjusted for daylight savings time: (1) Wilkinson's testimony that when she arrived at Plaintiff's house around 3:00 p.m., she saw police officers going in and out of Plaintiff's residence, prior to the issuance of the search warrant; (2) photographs 8516 and 8531, time stamped as taken by Defendant Zinram at 2:40 p.m. and 2:52 p.m., which times were consistent with the time indicated on Plaintiff's kitchen clock (approximately 2:45 P.M.) depicted in the photos; and (3) photographs 8644-8646, time stamped as being taken by Trooper Zinram at 3:28 p.m., and showing Trooper Pierce inside Plaintiff's residence prior to Defendant Kloss's arrival with the search warrant. The Court further finds that a reasonable officer would have been on notice that entering and searching Plaintiff's residence under these circumstances was a violation of Plaintiff's rights under the Fourth Amendment and, therefore, Defendants Pierce and Zinram

would not be entitled to qualified immunity. Accordingly, Defendants' motion for summary judgment is denied to the extent it seeks summary judgment on Plaintiff's claim that Defendants Pierce and Zinram violated Plaintiff's rights under the Fourth Amendment by entering Plaintiff's residence in the afternoon of July 25, 2013, prior to Defendant Kloss's return to Plaintiff's residence with a search warrant.

<u>**2.**</u>      <u>**Plaintiff's Fourth Amendment claim based upon Defendants' seizure of Plaintiff's residence while they awaited a search warrant.**</u>

Next, Plaintiff claims that Defendants Machacek, Sterniak, Kloss, Pierce, and Dietz violated his Fourth Amendment rights when they seized his residence while they awaited Defendant Kloss's return with the search warrant. In response, Defendants contend that they are entitled to summary judgment on this claim because their conduct in connection with the "seizure" or securing of Plaintiff's home while Defendant Kloss obtained the search warrant did not violate Plaintiff's Fourth Amendment rights and, alternatively, Plaintiff's right to be free from such a seizure was not clearly established and known to reasonable officers at the time of their conduct and, therefore, they are entitled to qualified immunity.

In <u>Segura v. U.S.</u>, 468 U.S. 796 (1984), the Supreme Court held "that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." <u>Segura</u>, 468 U.S. at 810. Thus, under circumstances where the temporary securing of premises is "undertaken to preserve the status quo while a search warrant is being sought," that conduct will not violate the Fourth Amendment. <u>Id.</u> at 809.

Here, the Court finds that, in light of Ms. Fewell's body being found in Plaintiff's bedroom and Plaintiff's statements that he had found the gun in Ms. Fewell's hand and moved it, the gun was his gun, and Ms. Fewell had told him the night before that she had been unfaithful to

him with his friend, the Defendants had probable cause to believe that a homicide happened in

Plaintiff's residence and, therefore, to temporarily secure Plaintiff's residence, including keeping

Plaintiff out of the residence. Defendants' motion for summary judgment on Plaintiff's claim that

they violated his rights under the Fourth Amendment when they seized his residence while they

awaited Defendant Kloss's return with the search warrant will be granted.

### 3.      Plaintiff's Fourth Amendment claim that the search warrant was not supported by probable cause

Plaintiff claims that Defendant Kloss violated his Fourth Amendment rights by obtaining

a search warrant based upon a false affidavit of probable cause. The Defendants contend that

summary judgment should be granted with respect to this claim, arguing that the District Justice

had a sufficient basis to find probable cause for a search warrant and that "Plaintiff cannot

identify any false statements or omissions in Kloss's Affidavit, let alone any that were material

to the finding of probable cause." (ECF No. 94 at pp. 17, 20-21).

In response, Plaintiff argues "the Warrant Application was completed with such reckless

disregard for the truth, as to be lacking any indicia of probable cause." (ECF No. 99 at p. 8). In

particular, Plaintiff contends that, while "Kloss cites that pipes and bongs were in plain view

throughout the residence[,] [n]o bongs in plain view were seized and no pipes in plain view were

seized, except that pipes were seized from the bedroom of my co-tenant… Kloss even later

admits to Judge Garhartt at the Suppression hearing that no bongs were seen in plain view." (Id.,

citing ECF No. 100-3 at p. 49). Plaintiff contends further that "Kloss cites that prescription pills

are seen in the residence (on the counter) not in their containers, yet photographic evidence

refutes this." (Id. at pp.8-9). Plaintiff also argues that Defendant Kloss stated in the Affidavit of

Probable Cause that the firearm did not belong to Plaintiff, thereby asserting that the firearm was

illegally possessed and/or was evidence of Plaintiff's dishonesty, without first contacting the

person alleged to be the rightful owner of said firearm (Cyril Nick Ley Jr) or requesting from Plaintiff a sales/registration form for the gun. (Id. at pp. 9-10). Plaintiff continues: "Kloss alleged to see several items in plain view. The problem is that in every case of what he alleged to be in plain view (in my room and in the common area), [h]e either failed to seize the alleged evidence, or photographic evidence refutes his narrative." (Id. at p. 10). Plaintiff also faults Defendant Kloss for failing to establish that Matthew Karash has normal hearing, and not including in the Affidavit of Probable Cause that Matthew was sleeping throughout the night. (Id. at p. 11).

The Third Circuit has explained that "[a] section 1983 plaintiff who challenges the validity of a search warrant by asserting that law enforcement agents submitted a false affidavit to the issuing judicial officer must satisfy the two-part test developed by the Supreme Court in Franks v. Delaware, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir.1997). Under the Franks test, as explained in Mulvihill, "the plaintiff must prove, by a preponderance of the evidence, (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." Id.

The first step of the test requires the Court to determine whether the original Affidavit contains recklessly false statements or omissions. The Third Circuit explained the standards for false assertions or omissions:

> Assertions are made with reckless disregard when, "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." [Wilson, 212 F.3d] at 788 (internal quotations omitted). Assertions can be made with reckless disregard for the truth "even if they involve minor details— recklessness is measured not by the relevance of the information, but the

> demonstration of willingness to affirmatively distort truth." <u>Id</u>. "[O]missions are
> made with reckless disregard for the truth when an officer recklessly omits facts
> that any reasonable person would know that a judge would want to know" in
> making a probable cause determination. <u>Id</u>. at 783.

Reedy v. Evanson, 615 F.3d 197, 213 (3d Cir.2010). The Third Circuit has acknowledged that

because "[a]ll storytelling involves an element of selectivity, [w]e cannot demand that police

officers relate the entire history of events leading up to a warrant application with every

potentially evocative detail...." <u>Wilson v. Russo</u>, 212 F.3d 781, 787–88 (3d Cir.2000). "Rather, a

court employs the 'common sense approach' of only looking to the omissions that are 'highly

relevant.'" <u>McGriff v. Marks</u>, 2013 WL 1830948, at *10 (W.D.Pa. Apr. 30, 2013), <u>quoting</u>

<u>Wilson</u>, 212 F.3d at 788. In making this determination, the court should view the facts not "from

the deliberately slanted perspective that summary judgment demands" but rather "with

scrupulous neutrality." <u>Reedy</u>, 615 F.3d at 232 n. 24 (3d Cir.2010).

Even if the Court determines that a probable cause affidavit was prepared with reckless

disregard for the truth, the Plaintiff's claim will still fail if the Court finds that the inaccuracies or

omissions were not "material, or necessary, to the probable cause determination." <u>Wilson</u>, 212

F.3d at 789. In making the materiality determination, a court must perform "reconstructive

surgery" on the original affidavit by first "excis[ing] offending inaccuracies and insert[ing] the

facts recklessly omitted, and then determin[ing] whether or not the 'corrected' warrant affidavit

would establish probable cause." <u>Id</u>. At this stage, the Court "engage[s] in the routine probable

cause analysis, weighing the inculpatory evidence against any exculpatory evidence available to

the officer." <u>Id</u>. at 791. In conducting this weighing, the Court must return to the ordinary

summary judgment standard, and consider the Corrected Affidavit as "simply ... one more set of

24

factual assertions that must then be viewed in the light most favorable to the non-movant."
Reedy, 615 F.3d at 214 n. 24.

Here, the facts of record do not support many of Plaintiff's contentions relative to his claim that Defendant Kloss obtained a search warrant based upon a false affidavit of probable cause. First, contrary to Plaintiff's argument, several of the photographs taken inside Plaintiff's residence show what appear to be drugs and drug paraphernalia in Plaintiff's residence, in areas of the residence seen by Defendant Kloss in the morning of July 25, 2013. Specifically, photographs 8583 and 8584 appear to show marijuana, and photographs 8542, 8551, and 8552 appear to show a pipe. (ECF No. 93-4 at pp. 47-49, 54-55). Also, Defendant Angelo testified that he saw what appeared to him to be marijuana in Plaintiff's bedroom. (ECF No. 93-3, transcript of Angelo deposition, at p. 67 (internal p. 8)).

More importantly, the Court finds that, even if the Affidavit of Probable Cause was purged of all of the "falsities" argued for by Plaintiff, and all of the alleged omissions cited by Plaintiff were added to the affidavit (i.e. Plaintiff was the owner of the firearm used to shoot Ms. Fewell and Matthew Karash, who had normal hearing, had slept the entire night of the shooting), the Affidavit of Probable Cause still would have stated that Ms. Fewell was Plaintiff's girlfriend; her body was found by Plaintiff in Plaintiff's bedroom, dead from a gunshot wound; Plaintiff stated that the gun had been in Ms. Fewell's hand when he found her, and that he had moved the gun; the gun was registered to him; and the shooting occurred shortly after Plaintiff had discovered and told Ms. Fewell that he knew about Ms. Fewell engaging in sexual relations with Plaintiff's friend. As such, the Affidavit of Probable Cause would have been more than sufficient for the magisterial district judge to find probable cause to search Plaintiff's residence for "[a]ny property and/or evidence, physical, electronic or otherwise, pertaining to the suspicious

death/criminal homicide of the victim, Traci Lynn FEWELL; [redacted]; LKA:8013 Station

Road, Erie , PA 16510 that occurred on 07/25/13." Accordingly, the Court finds that Plaintiff has

not and cannot show that an intentionally or recklessly false statement or omission made by

Defendant Kloss was determinative of probable cause, and therefore, summary judgment will be

granted in favor of Defendant Kloss as to Plaintiff's claim that he violated Plaintiff's Fourth

Amendment rights by preparing an Affidavit of Probable Cause "lacking any indicia of probable

cause."

### 4.   Plaintiff's Fourth Amendment claim against Defendants (other than Trooper Sterniak) based upon the manner in which the search warrant was executed

Defendants contend that summary judgment should be granted as to Plaintiff's claim that

all Defendants, other than Defendant Sterniak, violated his Fourth Amendment rights when "he

was not shown or provided the Warrant before the search, officers did not read the warrant

themselves, and inventories were not properly done." In particular, Defendants contend that

"even if Plaintiff's version of events is accepted as true:" (1) the Fourth Amendment does not

require that the officer executing a search warrant present the owner of the premises with a copy

of the warrant prior to conducting the search; (2) any failure to provide Plaintiff with the

inventories from the search does not result in a Fourth Amendment violation but rather, at worst,

implicates "ministerial procedures or non-compliance with the rules of criminal procedure;" and

(3) Defendants are not even aware of a "rule" that requires officers executing a search warrant to

independently read and verify a warrant. (ECF No. 94, Defendants' Brief, at pp. 31-32 (citations

omitted)).

In response, Plaintiff contends that: (1) none of the officers or persons who entered his

house (other than Defendant Kloss) "testified to having read the warrant prior to [the] search and

none of them testified to having ensured the warrant was signed by a neutral magistrate" (ECF

No. 99, Plaintiff's Opposition Brief, at p. 22 (citing <u>Groh v. Ramirez</u>, 540 U.S. 551 2004)); and

(2) Defendant Kloss's execution of the search warrant violated Plaintiff's Constitutional rights

because he allegedly failed to "knock and announce" and hand a copy of the Warrant to Plaintiff,

and he failed to prepare inventories in Plaintiff's presence, without reasonable explanation (<u>Id.</u> at

p. 27).

Turning first to Plaintiff's contention that he was not given the search warrant until very

late in the afternoon of July 25, 2013, when the search was completed, even assuming that this

version of the facts is supported by the evidence of record, the Court finds that this timing does

not violate Plaintiff's rights under the Fourth Amendment. In <u>U.S. v. Wright</u>, 777 F.3d 635 (3d

Cir. 2015), the appellate court explained:

> The Supreme Court has observed that "neither the Fourth Amendment nor
> Federal Rule of Criminal Procedure 41[3]" requires "the executing officer
> [to] present the property owner with a copy of the warrant before
> conducting his search." *United States v. Grubbs*, 547 U.S. 90, 98–99, 126
> S.Ct. 1494, 164 L.Ed.2d 195 (2006). The Fourth Amendment "protects
> property owners not by giving them license to engage the police in a
> debate over the basis for the warrant, but by interposing, [before the
> search], the 'deliberate, impartial judgment of a judicial officer ... between
> the citizen and the police,' and by providing, [after the search], a right to
> suppress evidence improperly obtained and a cause of action for
> damages." *Id*. at 99, 126 S.Ct. 1494 (second alteration in original) (quoting
> *Wong Sun v. United States*, 371 U.S. 471, 481–482, 83 S.Ct. 407, 9
> L.Ed.2d 441 (1963)).

<u>Wright</u>, 777 F.3d at 641. Therefore, to the extent Plaintiff's Fourth Amendment claim against the

Defendants is premised upon their failure to serve Plaintiff the search warrant prior to their

searching his residence, Defendants' motion for summary judgment is granted.

---

[3] Fed.R.Crim.P. 41(f)(1)(c) provides in relevant part, "[t]he officer executing the warrant must give a copy of the
warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was
taken or leave a copy of the warrant and receipt at the place where the officer took the property."

Second to the extent that the defendants did not "knock and announce" prior to entering Plaintiff's home, such conduct did not violate Plaintiff's rights under the Fourth Amendment because it is not necessary to "knock and announce" "if knocking and announcing would be 'futile'," and "knocking and announcing" would have been futile here where it was known by the Defendants that Plaintiff's residence was unoccupied and Plaintiff was waiting outside of the residence with the police for Trooper Kloss to return with the search warrant. Hudson v. Michigan, 547 U.S. 586, 589-90 (2006), quoting Richards v. Wisconsin, 520 U.S. 385, 394 (1997). See also U.S. v. May, 2010 WL 2985899,  at *3 (S.D. Ala. July 27, 2010) (concluding that where defendant was already in custody when officers arrived at his home to execute the search warrant, the residence's other occupants (a woman and two children) were standing outside when the search warrant team arrived, and the woman had advised officers that no one else was in the house, "[u]nder those circumstances . . . for the officers to 'knock and announce' before going inside an unoccupied house would have been a hollow, futile, and utterly pointless exercise.").

Third, Plaintiff contends that Defendants violated his rights under the Fourth Amendment when they did not complete the inventories in Plaintiff's presence, as allegedly required under state and federal rules of criminal procedure. Presumably the applicable rules upon which Plaintiff relies are Fed.R.Crim.P. 41, and its state counterpart, Pa.R.Crim.P. 209; however, it is beyond dispute that the execution of the search warrant at issue was solely a state undertaking, without any participation by federal officers or agents. Thus, the only procedural rule that would have any relevancy to this case is Pa.R.Crim.P. 209. The version of Pa.R.Crim.P. 209 in effect on July 25, 2013, provided:

> An inventory of items seized shall be made by the law enforcement officer serving a search warrant. The inventory shall be made in the presence of

the person from whose possession or premises the property was taken, when feasible, or otherwise in the presence of at least one witness. The officer shall sign a statement on the inventory that it is a true and correct listing of all items seized, and that the signer is subject to the penalties and provisions of 18 Pa.C.S. §4904(b)--Unsworn Falsification to Authorities. The inventory shall be returned to and filed with the issuing authority.

Pa.R.Crim.P. 209 (A).

Here, although it was feasible to do so, the inventories were not prepared in Plaintiff's presence and, thus, were prepared in violation of Pa.R.Crim.P. 209. Nevertheless, "'[f]ederal cases interpreting a comparable rule of criminal procedure, see Rule 41(d) of the Federal Rules of Criminal Procedure, have concluded that although important, the procedures required for execution and return of the warrant are ministerial and that irregularities should not void an otherwise valid search absent a showing of prejudice …'" United States v. Primo, 369 F.Supp.2d 607, 635 (W.D.Pa. Mar. 23, 2005), quoting Commonwealth v. Mason, 507 Pa. 396, 404, 490 A.2d 421 (citations omitted). There is no evidence that this procedural defect caused any prejudice to Plaintiff or that the Defendants acted in bad faith by failing to have Plaintiff present during the inventory. Therefore, Plaintiff's rights under the Fourth Amendment were not violated by the Defendants' failure to complete the inventories in Plaintiff's presence as required under Pa.R.Crim.P. 209, and Defendants' motion for summary judgment on this Fourth Amendment claim will be granted.

Fourth, with respect to Plaintiff's claim that all of the Defendants, except Defendant Kloss, violated his Fourth Amendment rights by searching his residence without reading the search warrant prior to executing it, the Court was unsuccessful in locating any reported cases that established that a law enforcement officer who fails to read a search warrant prior to executing it thereby violates a plaintiff's Fourth Amendment rights. While Plaintiff cites to Groh v. Ramirez , 540 U.S. 551 (2004) as support for such a legal proposition, the Court finds that the

Groh decision is inapposite. In Groh, the Court held that a search was unreasonable under the Fourth Amendment where the warrant on which the search was based did not list the items to be seized at all, and further concluded that an action for damages under Bivens could proceed because the petitioner, the officer who executed the search warrant, was not entitled to qualified immunity where he had failed to read the warrant because if he had read the warrant, he would have known the warrant was so obviously deficient. Groh, 540 U.S. at 563. "It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted." Id. "That is not a duty to proofread; it is, rather, a duty to ensure that the warrant conforms to constitutional requirements." Id. at 563 n. 6. See also U.S. v. Watson, 498 F.3d 429, 433 (6th Cir. 2007) ("Groh does not impose a strict proofreading requirement upon an officer obtaining a search warrant, but rather a duty to ensure that the warrant conforms to constitutional requirements.") (citation omitted). Therefore, the Court concludes that, even assuming arguendo that said conduct violates the Fourth Amendment, there was no clearly established precedent that would have put the Defendants on notice that they violated Plaintiff's rights under the Fourth Amendment by failing to read the search warrant prior to executing it. Therefore, Defendants Machacek, Zinram, Pierce, Dietz, Angelo, Rogers, Weindorf,[4] are entitled to qualified immunity with respect to this Fourth Amendment claim and Defendants' motion for summary judgment as to such claim will be granted accordingly.

Finally, to the extent that Plaintiff cites the failure of the Defendants to notice the lack of a signature on the search warrant by the magisterial district judge as having violated his Fourth

---

[4] Plaintiff stated in his Opposition Brief that "[i]f Sterniak isn't signed on the log and denies entry I will abandon my claim against Sterniak for this particular aspect of the violations that occurred, but only for this aspect." (ECF 99 at pp. 30-31). Defendant Sterniak is not signed in on the crime scene entry log as participating in the search of Plaintiff's residence once the search warrant arrived, and he stated in his deposition that he remained outside of Plaintiff's residence for the remainder of the day after his brief entrance in the morning of July 25, 2013, and that he left before the search warrant arrived. (ECF No. 93-1 at pp. 41-42; ECF 93-4 at p. 6 (internal p. 24)).

Amendment rights, the Court in U.S. v. Jackson, 617 F.Supp.2d 316, 324 n. 7 (M.D. Pa. 2008),

aptly found that "the text of the Fourth Amendment does not mandate that a warrant be signed,

making a lack of signature more akin to the technical mistakes discussed in *Sheppard* and

referenced in *Groh*"), citing Groh, 540 U.S. at 551; Massachusetts v. Sheppard, 468 U.S. 981

(1984). In particular, the Court in Jackson observed:

> [p]rovided that a search warrant is applied for in person, the text of neither
> the Fourth Amendment nor Federal Rule of Criminal Procedure 41
> required the issuing authority to sign the warrant. Instead, the Fourth
> Amendment dictates that a warrant shall not "issue" unless it is supported
> by probable cause. Generally, an issuing authority's finding of probable
> cause is conveyed via his or her signature on a warrant. However, signing
> a search warrant is just one of a number of methods that an issuing
> authority may use to signal that the warrant complies with the Fourth
> Amendment's probable cause requirement. In the absence of a signature,
> "a court may consider other evidence that the judge found probable cause
> and approved the warrant. To hold otherwise would elevate form over
> substance and allow inadvertent, procedural errors to vitiate substantively
> valid warrants.

Id. at 320-21 (citations omitted).

Upon review of the Application for Search Warrant and Authorization form in this case,

it is apparent that Defendant Kloss applied for the search warrant in person. (ECF No. 93-1 at p.

2). Magisterial District Judge Hammer signed and dated that part of the form which indicated

that the Application had been sworn to and subscribed before him on July 25, 2013. Id.  The box

on the Search Warrant was checked that stated: "This warrant shall be served as soon as

practicable and shall be served only between the hours of 6AM to 10PM but in no event later

than," and the date and time the search warrant was issued was filled in: "25th day of July 2013 at

3:15 PM, o'clock." Id. It was not signed by Judge Hammer, as the issuing authority, but, instead,

was twice stamped with Judge Hammer's seal. Id.

In light of the above, the Court finds that there is sufficient evidence from which to conclude that the Judge Hammer found probable cause and approved the search warrant; thus, the warrant "contains sufficient indicia of issuance to satisfy Fourth Amendment requirement." Jackson, 617 F.Supp.2d at 321. Accordingly, the search warrant did not violate the Fourth Amendment, and any failure by Defendant Kloss or the other Defendants to notice that the search warrant was not signed by the issuing authority could not have resulted in a violation of Plaintiff's Fourth Amendment rights.

An appropriate Order follows.

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: September 26, 2017